FRAZIER & COOPER v. THE K. C., ST. J. & C. B. RY. CO.

1. Railroads: SHIPMENT OF STOCK: DELAY IN. Where the stock to be shipped by plaintiff was not loaded upon the arrival of the defendant's train, and was not even in the yards of the company, but in a private yard, and had not been given into the possession of any authorized agent of defendant, it was *held* that defendant was not liable for refusing to delay the train until the stock could be loaded, notwithstanding the same train took cars of stock at other stations later, although in these instances the locomotive was required to assist in loading the cars, while in plaintiff's case it was not.

*Appeal from Pottawattamie Circuit Court.*

SATURDAY, JUNE 8.

THE plaintiffs claim of defendant the sum of ninety dollars and ninety cents, for an alleged failure of defendant to take and ship for plaintiffs four car loads of hogs. The cause was tried by a jury. Both parties asked for special findings.

The plaintiffs moved for judgment on the special findings. The court overruled the motion, and rendered judgment for defendant for costs. The plaintiffs appeal.

*Stow & Hammond*, for appellants.

*Sapp & Lyman*, for appellee.

DAY, J.—At the instance of plaintiffs the jury returned the following special findings :

Was not there one car of the plaintiffs' stock loaded, and the remainder in the yards of defendant ready for loading, before defendant's train left the station? Ans.—Yes.

Did the train wait at all on account of plaintiffs' stock at Watson? Ans.—No.

Were the stock yards of the defendant in a suitable condition in which to keep plaintiffs' stock? Ans.—No.

Were the yards suitably supplied with water? Ans.—No.

Did not the same train stop and load stock at the next station? Ans.—Yes.

How many loads of hogs did the same train stop and load at the next station? Ans.—Five or six.

At the next station, Phelps, did not the same train stop and load several cars of hogs, some of which were brought in on wagons and weighed after the train arrived? Ans.—Yes.

What was the reason that the hogs of plaintiffs were put in the private yard at Watson? Ans.—Defendant's yards not suitable.

Did not the plaintiffs, after loading several cars at Hamburg, come to Watson on the same train and proceed without any unnecessary delay to load the hogs in question? Ans.—Yes.

Did not the agent at Watson and conductor tell plaintiffs to load, and did they not then proceed to get the hogs into the yard and did load one car? Ans.—Yes.

Did not the station agent at Watson tell the plaintiff Cooper, but a few days previous, he need not load two cars he then had there until after the train arrived? Ans.—Yes.

How much did plaintiffs lose by shrinkage on account of delay in the shipment? Ans.—Five hundred pounds at $6.65—$33.25.

How much did they lose by decline in market? Ans.—Ten cents per hundred pounds on fifty-five thousand four hundred pounds—$55.40.

How much did they lose in extra feed? Ans.—$3.50.

How much did they lose in time and expenses? Ans.—$10.00.

Was the conduct of the K. C., St. J. & C. B. R. Co., in the matter of receiving and shipping plaintiffs' stock at Watson, the usual or customary course pursued by railroad companies in the shipping of stock? Ans.—It was unusual conduct in the K. C., St. J. & C. B. R. Co. to leave those loaded with stock, but not unusual so far as the balance of the hogs in the yard were concerned.

Was not the order, when made for the cars at Watson, for four cars to ship hogs south on the next day? Ans.—Yes.

Would the train of defendant have been detained longer in taking the four car loads of hogs, in the condition the train left them at Watson, than they were in taking and loading an equal number at Phelps? Ans.—No.

At the instance of the defendant the jury returned the following special findings:

Were the hogs in controversy in the yards, or on the depot grounds of the defendant at Watson, at any time before the south-bound freight train arrived at that station on the 14th day of December, 1875? Ans.—No.

Were the hogs in controversy in the yards, or on the depot grounds of the defendant at Watson, when said freight train arrived at that station on the said 14th day of December? Ans.—No.

Were they not up to that time in a private yard in no way controlled or used by defendant? Ans.—Yes.

Was there any person at Watson authorized in any manner to act for Frazier & Cooper, at any time after five o'clock

P. M. of December 13, 1875, and before the arrival of said train on the 14th? Ans.—No.

Were the hogs in controversy given into the control of any authorized agent of defendant at any time previous to the arrival of said train at Watson on December 14th? Ans.—No.

When were the cars placed at the Watson station by defendant, in which to ship said hogs? Ans.—Sometime during the night of the 13th.

Had the plaintiffs notified the station agent at Watson, at that time, to what particular station the hogs were to be shipped? Ans.—No particular station, but south to St. Joseph or Kansas City.

Had the plaintiffs notified the station agent at Watson to what particular station said hogs were to be shipped at the time the freight train aforesaid arrived there on the 14th day of December? Ans.—No.

Had they so notified him at the time the said freight train received orders not to wait for these hogs? Ans.—No evidence that they stated at any time to what particular station they were to go, only south.

Were there any of the hogs in controversy in the company's yards or on their depot grounds at Watson until after the freight train had received such orders? Ans.—Yes.

About what time, on the 14th day of December, did the said freight train arrive at Watson? Ans.—Between one and two o'clock.

Did the plaintiffs notify any authorized agent of the defendant that any of the hogs at Watson were loaded into the cars until after the train had received orders to go on? Ans.—No.

Whose duty is it to load the stock into the cars after they are placed in proper position—the station agent, or the shippers, which? Ans.—It is the duty of both shippers and employes of the railroad company.

Is it not necessary, under the customs and rules for ship-

ping stock, that, after the stock is loaded, a way-bill should be made, and also a contract of shipment signed before the car is ready to be put into a train? Ans.—Yes.

Has a conductor, under such rules and customs, a right to take a car into a train until this has been done? Ans.—No.

Has he a right to take a car into his train until he has been notified by the station agent that the car is ready for transportation? Ans.—No.

Had the plaintiffs furnished the station agent at Watson the necessary data from which he could make up the way-bills and contract, up to the time the said train was ordered to go on? Ans.—No.

Had they done so up to the time the train left Watson? Ans.—No.

Were the cars placed at the yards of the defendant, in a suitable position for being loaded, on the night of the 13th of December? Ans.—Yes.

Could these cars have been loaded without the aid of a locomotive? Ans.—Yes.

Is it not the custom, at stations where it can be done, to load stock cars without the aid of a locomotive? Ans.—It is customary to load with or without the aid of an engine.

Is it not the custom, when the loading can be done without the aid of a locomotive, to have the cars loaded by the time of the arrival of the train which is to transport them? Ans.—It is usually customary to do so.

Is it not the custom, at stations where a locomotive is necessary for loading, to load all that can be loaded without its use, before the arrival of the train which is to take the cars. Ans.—It is usually customary to do so.

Is it not the custom, at stations where a locomotive is necessary for loading, to load the cars remaining unloaded after the arrival of the train? Ans.—Yes.

Had the hogs in controversy been given into the control of any authorized agent of defendant at any time previous to the time the said freight train of December 14th received orders to

leave the Watson station, and if so to whose control? Ans.
—No.

Did the station agent at Watson notify the conductor of
the freight train, on the 14th day of December, that the cars.
in controversy, or any of them, were ready for transportation?
Ans.—No.

Were the cars, or any of them, containing the hogs of plain-
tiffs, loaded, the hogs counted, the way-bills made out, and the
shipper's contract signed, before said freight train left the
Watson station? Ans.—One car loaded, but not counted; no,
way-bill made out or contract signed.

Were not the stock yards of defendant in suitable condition
from which to load hogs? Ans.—Yes.

Did not Cooper, one of the plaintiffs, leave the hogs in said
yard twenty-four hours previous to their being shipped on
December 16th? Ans.—No evidence to that effect.

Were not the cars at Phelps loaded when the train arrived
there, so far as it could be done, without the aid of a locomo-
tive? Ans—They were loading.

Was it not necessary to use the locomotive at Phelps to
load the balance of the cars? Ans.—Yes.

Was there any delay at Phelps because the hogs were not
in the yards of the company? Ans.—No.

Does not the train dispatcher have control of the movements.
of the train? Ans.—Yes.

We have set out in full the special findings of the jury,
because upon them the court acted in rendering judgment for
the defendant. We are fully satisfied that the action of the
court was right.

From these special findings it appears that the plaintiffs came
to Watson on the same train on which they
expected to ship their hogs. The hogs to be
shipped were not in the yards or on the depot
grounds of the defendant when the train arrived at Watson,
but were in a private yard in no way controlled or used by
defendant. They had not been given into the control of any

1. RAILROADS:
shipment of
stock: delay
in.

authorized agent of defendant. Defendant had not been notified to what particular station the hogs were to be shipped. Cars were placed at the yards of defendant, the night previous, in a suitable condition to be loaded, and they could have been loaded without the aid of a locomotive. Under such circumstances the plaintiffs had no right to demand or expect that the defendant's train should delay at the station until the hogs should be driven into the defendant's stock yards, loaded, way-bills made out, contract of shipment signed, and the cars placed in the train. If such delay could be demanded at one station, it could be demanded at every station on defendant's road. Both humanity and interest require that stock trains shall go forward with all reasonable dispatch. The plaintiffs should have left some one at Watson in charge of their hogs, and had them loaded and ready for shipment when the train arrived. Each train must be moved with reference to all the other trains on the road. A delay of a few minutes at one station might occasion a corresponding delay of every train on the line of road, and even result in accidents, destructive of property and life. No person desiring to become a passenger upon a train could rightfully demand a delay of one minute to enable him to reach the train and get on board. Upon what principle, then, can these plaintiffs demand damages because the defendant's train did not wait until they could drive their hogs into defendant's yard, load four cars, count them, have way-bill made out, shipping contract signed, and the cars placed in the train? But plaintiffs say the yards of defendant were not in suitable condition, and hence they were not required to have their hogs in defendant's yards. The special findings show the yards of defendant were not in suitable condition for keeping plaintiffs' stock, not being supplied with water. The special findings further show that the yards of defendant were in a suitable condition from which to load hogs. There is nothing shown to excuse plaintiffs from driving their hogs to defendant's yards, and having them loaded in time for the train.

It is further said that the agents of defendant a few days previously told Cooper he need not load two cars he then had there until after the train arrived. This particular transaction would not estop defendants from insisting upon a compliance with the usual custom as to future shipments of a greater number of car loads. It is further said that the train stopped at the next station, Phelps, and loaded several cars of hogs, some of which were brought in in wagons and weighed after the train arrived. The special findings show that there was no delay at Phelps because the hogs were not in the yard of the company, and that the cars at Phelps were loaded when the train arrived, so far as could be done without the use of a locomotive. The very fact that the train had to stop and use its locomotive to load at Phelps is a reason why it ought not to be delayed at Watson, where the loading could be done without the use of a locomotive. It is said, however, that one car was loaded, and that plaintiffs should have damages because it was not taken in the train. But the hogs in this car were not counted, and no way-bill was made out, nor does it appear that plaintiffs desired or were willing that this car should go forward alone.

AFFIRMED.